UNITED TOOL AND INDUSTRIAL SUPPLY CO., INC. &
another *vs.* ANTHONY TORRISI & others.

Essex.    May 6, 1969. — June 2, 1969.

Present: WILKINS, C.J., WHITTEMORE, CUTTER, SPIEGEL, &
REARDON, JJ.

*Unlawful Interference. Trade Secret. Sale,* Sale of stock, Sale of good will,
Contract of sale. *Contract,* Implied contract, Agreement not to com-
pete. *Good Will.*

Merchandising methods are not trade secrets. [106]

Where it appeared in a suit in equity in substance that one who had organ-
ized the plaintiff, a corporation engaged in the sale of tools and ma-
chinery, and who had been its president and had owned or controlled
about 65% of its shares had signed an agreement to sell all of its shares
without previous discussion of price with two employees, of whom one
owned about 5% of its shares and the wife of the other owned about 4%
of its shares, that such employees had not participated in the negotia-
tions or made any agreement with respect to the sale of stock and one
of them did not wish to sell, that the purchaser insisted on purchasing
all the shares and ultimately did so, that the agreement made placed
no value on the good will of the plaintiff and contained no promise by
the seller therein not to compete with it, and that the two employees
had no information of a confidential nature respecting the plaintiff's
prices and customers, it was held that in the circumstances an implied
covenant on the part of the two employees not to compete with the
plaintiff had not arisen upon the sale of the stock, that the result of a
temporary injunction restraining the two employees from selling tools
and machinery in certain areas was inequitable, and that a final decree
permanently enjoining such employees from communicating with cus-
tomers and suppliers of the plaintiff for the purpose of selling tools and
machinery must be reversed and the suit dismissed. [107–108]

PETITION IN EQUITY filed in the Probate Court for the
county of Essex on February 2, 1968.

The case was heard by *Sullivan, J.*

*Fredric S. O'Brien (Maurice Rappaport* with him) for the
respondents.

*Raymond M. Sullivan* for the petitioners.

WILKINS, C.J.   United Tool and Industrial Supply Co., Inc. (United), and another Massachusetts corporation which owns all the United stock, R. P. S. Corporation (R. P. S.),[1] on February 2, 1968, brought this petition in equity in the Probate Court, Essex County, to enjoin the respondents Anthony Torrisi, Peter Torrisi, and A. Line Tools, Inc. (A. Line), also a Massachusetts corporation, from engaging in selling tools and machinery in the areas in which United was engaged.   On that date a prayer for a temporary order was granted restraining the respondents from engaging in the sale of tools and machinery in three counties in this Commonwealth and four counties in New Hampshire.

On May 1, 1968, a decree was entered permanently enjoining the respondents without limitation as to time or space from communicating with customers and suppliers of United for the purpose of engaging in the sale of tools and machinery.   The petitioners and the respondents appealed.

There are no findings of fact, and the evidence is reported. G. L. c. 215, § 9.   The entry of the decree implies a finding of every fact, permissible on the evidence, to support the conclusion of the judge.   These will not be reversed unless plainly wrong.   *Hopkins* v. *Commissioner of Corps. & Taxn.* 320 Mass. 168, 169–170, and cases cited.   *Colbert* v. *Hennessey*, 351 Mass. 131, 134.   And from the evidence we can find facts.   *Lowell Bar Assn.* v. *Loeb*, 315 Mass. 176, 178. As we have previously stated, this is not a desirable procedure for presenting precise issues on appeal.   See *Roseman* v. *Day*, 345 Mass. 93, 95–96.   As is apparent from our opinion, we have been unable to agree with the petitioners' extravagant claims as to many findings to be implied from the decree.

United was organized by Joseph Torrisi in 1957, and had its principal place of business in Lawrence.   It sold hardware, tools, and industrial supplies to customers by telephone, by personal calls of salesmen, and over the counter.

---

[1] We intimate no opinion whether R. P. S. as sole stockholder in United has a cause of action of its own.

Joseph Torrisi, president and treasurer, prior to November, 1967, owned 1,505 out of 2,932 authorized shares. Jackson Lumber Company, of which he is treasurer and principal stockholder, at that time owned 422 shares. The respondent Anthony Torrisi, brother-in-law of Joseph, owned 150 shares. The respondent Peter was Joseph's brother. Rose, Peter's wife, owned 125 shares. Joseph decided who would be chosen to office and employed. Anthony and Peter were directors, and had the honorary titles of vice-president. Anthony was purchasing agent, but six or seven others did some purchasing. Peter was sales manager with three other salesmen.

On October 26, 1967, Joseph signed a contract with Robert P. Sumberg, individually, owner of all shares in R. P. S., for the sale of all 2,932 shares of United at $85 a share. If Joseph could not deliver 2,932 shares, the buyer might at his option buy such shares as the seller could deliver at $85 a share. All shares except those held by Joseph were to be paid for in cash at the time of closing. Those of Joseph were to be paid for on stated dates not here material. No assets as such were acquired. In the contract there was no mention of the sale of good will nor of any promise by Joseph not to compete with United. In fact, the conclusion is inevitable that no value was placed on good will. United's accountant, who represented United in reaching the price of $85 a share, testified that at the discussions with Sumberg it was stated that "there was no price, nothing included for good will."

On November 9, 1967, R. P. S. was organized mainly to acquire the stock of United. Robert P. Sumberg was, and still is, president and treasurer of R. P. S. On that date R. P. S. purchased all the stock of United. Anthony and Rose received checks for $12,750 and $10,625, respectively.

The written resignation of every director and officer was to be delivered at the time of closing. Peter and Anthony each resigned as vice-president and director and from "such other office" as they might hold on the corporate records, but not until January 22, 1968, after Sumberg had an-

nounced he did not intend to pay the individual respondents the portion of their annual bonus attributable to profits from the beginning of the fiscal year until November 9, 1967.[1]

After resigning, the individual respondents activated A. Line, a dormant corporation organized by them in the early part of 1967.

The individual respondents had no information of a confidential nature respecting prices and customers. *American Window Cleaning Co.* v. *Cohen*, 343 Mass. 195. *Slade Gorton & Co. Inc.* v. *O'Neil*, 355 Mass. 4, 9–10. Compare *New England Overall Co. Inc.* v. *Woltmann*, 343 Mass. 69, 75. Merchandising methods are not trade secrets. *Associated Perfumers, Inc.* v. *Andelman*, 316 Mass. 176, 185. They could not be prevented from competing on this ground.

The substantial remaining question is whether the individual respondents in selling their stock implicitly promised not to compete.

Broadly speaking, when the entire assets of a business are sold, there is a presumption that good will passes. *Canadian Club Beverage Co.* v. *Canadian Club Corp.* 268 Mass. 561, 568. *Lynn Tucker Sales, Inc.* v. *LeBlanc*, 323 Mass. 721, 723. *Pitman* v. *J. C. Pitman & Sons, Inc.* 324 Mass. 371, 374. And it follows that after a voluntary sale of good will the seller cannot engage in a competing business which will derogate from that sale.

This doctrine was applied to transactions where the sale was of stock itself in *Tobin* v. *Cody*, 343 Mass. 716, 721, where it was said: "While it may be true that the good will of the business belongs to the corporation as an entity and not to the stockholders as such, the value of the good will is reflected in the value of the stock which was the subject of the sale. Where, therefore, the sellers of the stock have been active participants in the business and are in a position to control or affect its good will, we think not only that they may validly bind themselves by an express promise not to derogate from the good will reflected in the value of the

[1] The individual respondents each received a yearly salary of $11,700 and an annual bonus based on profits which the preceding year had been $4,000.

stock sold by competing with the buyers remaining in the business, but also that in appropriate circumstances such a promise can be implied in the sale of the stock itself."

In the case at bar there are important and critical distinctions from the *Tobin* case, in which the defendants who were held to have impliedly agreed not to compete had signed an agreement to sell their stock (at p. 718).[1] Here the respondents had made no contract. One of them owned no stock. The sale was brought about by Joseph who signed the only written contract and who controlled 1,927 of the 2,932 shares sold or 65.72%. Anthony's 150 shares were 5.11% and Rose's 125 shares were 4.26%.

The agreement of sale was a formal document prepared by lawyers. Prior to signing Joseph did not discuss the price with other stockholders. Anthony and Peter did not participate in the negotiations. They did not know when the sale was to take place, and were not present when the shares were transferred. Sumberg insisted on receiving all the shares, and although Anthony did not wish to sell, he and Rose, as well as Peter, had no choice but to accept the terms of sale.

We are of opinion that this is not an appropriate case where a promise by Anthony and Peter not to derogate from the good will reflected in the value of the stock sold can or should be implied from the sale of the stock itself.

If the corporate petitioners intended that there be imposed a permanent restraint, unlimited as to territory, against two men, one of whom is about sixty years of age, taking part in the type of work they had been performing and which they had no purpose to renounce, they should have openly and expressly contracted for it with the individual respondents. By the restraining order and injunction the individual respondents have already been restrained for over fifteen months. The result of the injunction is in-

---

[1] In *Cap's Auto Parts, Inc.* v. *Caproni*, 347 Mass. 211, 215, 216, a significant circumstance was that during the negotiations of the sale the defendant expressed an intention to retire. See the *Tobin* case, *supra*, 718, 722, fn. 2. No analogous statements were made by the individual respondents in the case at bar.

equitable and one which we cannot approve in the interests of justice.

The final decree is reversed, and the petition is to be dismissed with costs to the respondents, including costs of appeal.

*So ordered.*