935 So.2d 1140 (2006)
EASY REACH, INC. (Formerly Easy Reach Brush, Inc.) and Brant L. Cedotal, Appellants
v.
HUB CITY BRUSH, INC., Appellee.
No. 2005-CA-00952-COA.
Court of Appeals of Mississippi.
August 8, 2006.
*1141 R. Christopher Wood, attorney for appellants.
Lawrence Cary Gunn, Hattiesburg, attorney for appellee.
Before MYERS, P.J., IRVING and ROBERTS, JJ.
IRVING, J., for the Court.
¶ 1. Brant Cedotal, owner of Easy Reach, Inc., sued on behalf of himself and Easy Reach for a declaratory judgment to void a non-competition clause that bars Easy Reach from manufacturing its own brushes. The Forrest County Chancery Court declined to find that the non-competition agreement was invalid, and entered a judgment denying relief to Easy Reach and Brant. Believing the court's decision in error, Easy Reach and Brant appeal, asserting the following issues which we repeat verbatim:
[1] The Trial Court erred when it found that the non-competition clause contained within the Stockholders' Agreement dated June 23, 1994 was valid despite the fact that the terms of the non-competition clause was [sic] perpetual.
[2] The Trial Court erred when it applied the principle of law stated in Fought v. Morris, 543 So.2d 167 (Miss. 1989).
¶ 2. We find that the trial court erred in refusing to void the Easy Reach non-competition clause, and therefore affirm in part and reverse and render in part.

FACTS
¶ 3. Brant's father and grandfather purchased Piave Broom and Mop Manufacturing Company in 1964. After several years, Piave expanded its manufacturing to produce industrial brushes. In the early 1990s, Brant incorporated Hub City Brush, Inc. and Easy Reach Brush, Inc., which eventually was renamed "Easy Reach, Inc." As the chancellor found, "[a]ll three companies [Piave, Easy Reach Brush, and Hub City] did business with each other, until problems began to develop between the family members."
¶ 4. In an attempt to resolve the conflicts that had arisen, Piave merged with Hub City, while Brant retained full ownership of Easy Reach. The family members had the following stock ownership in the new Hub City: Brant Cedotal owned 60%, Robert Cedotal owned 20%, Wayne Cedotal *1142 owned 10%, and Cecil Cedotal owned 10% of the Hub City shares. Some time thereafter, according to the chancellor: "Robert and Wayne paid Brant a total of $240,000 to convey 15% of his stock in Hub City to them." Brant continued to retain full ownership of Easy Reach, but Hub City was now owned in the following proportions: Brant owned 45%, Robert owned 30%, Wayne owned 15%, and Cecil owned 10%. Hub City currently manufactures brushes, while Easy Reach manufactures telescopic handles. Easy purchases brushes for the telescopic handles from other sources and then sells its finished product at various locations.
¶ 5. All the stockholders of Hub City (Brant, Robert, Wayne, and Cecil) entered a stockholder's agreement on June 23, 1994. This agreement contains the following language in paragraph 11.1, which is titled "Covenant Not to Compete":
As a material inducement to sign this Agreement, each Stockholder agrees that as long as he or she is a Stockholder, he or she will not Compete with HUB CITY BRUSH and, further, that he or she will not Compete with HUB CITY BRUSH during the six-month period beginning on the closing date for the sale of his or her shares of the Stock under this Agreement.
This provision applies to the individual shareholders of Hub City, including Brant. Paragraph 11.2 applies specifically to Easy Reach as a corporate entity, and reads as follows:
Section 11.1 above will not apply to EASY REACH BRUSH, INC. It is hereby agreed by and between HUB CITY BRUSH and EASY REACH BRUSH, INC. that EASY REACH BRUSH, INC. shall not manufacture any brushes except paint brushes, and that HUB CITY BRUSH shall not compete with EASY REACH BRUSH, INC. in the sale to truckstops, RV dealers and truck dealers. Furthermore, HUB CITY BRUSH shall not manufacture extension or telescopic handles but EASY REACH BRUSH, INC. may manufacture and sell extension or telescopic handles.
¶ 6. Other facts, as necessary, will be related during our discussion of the issues.

ANALYSIS AND DISCUSSION OF THE ISSUES

1. Validity of the Non-Competition Clauses
¶ 7. Brant contends that "[t]he covenants not to compete lack precisely these two necessary elements [duration of restriction and geographical limits] and should be declared void as a matter of law and public policy in accordance with Mississippi precedent."

Standard of Review
¶ 8. "When considering the enforceability of restrictive employment agreements, we review the entire record and `the evidence which supports or reasonably tends to support the findings of fact made below, together with all reasonable inferences which may be drawn therefrom and which favor the lower court's findings of fact, must be accepted.'" Kennedy v. Metro. Life Ins. Co., 759 So.2d 362, 364(¶ 3) (Miss.2000) (quoting Sta-Home Health Agency, Inc. v. Umphers, 562 So.2d 1258, 1263 (Miss.1990)). "We will not disturb the findings of the lower court when they are supported by substantial evidence unless the Chancellor abused his discretion, was manifestly wrong, clearly erroneous or an erroneous legal standard was applied." Id. (citations omitted).
¶ 9. Non-competition clauses have generally been viewed unfavorably in Mississippi jurisprudence: "Non-competition *1143 agreements have been viewed by this Court as `restrictive contracts [which] are in restraint of trade and individual freedom and are not favorites of the law.' Only when such agreements are reasonable will they be considered valid and upheld by this Court." Id. at 364(¶ 4) (citations omitted). Specifically, "the enforceability of a non-competition agreement [is] largely predicated upon the reasonableness and specificity of its terms, primarily, the duration of the restriction and its geographic scope." Id.
¶ 10. Because 11.1 and 11.2 both relate to different entities (11.1 applies only to Brant himself, while 11.2 applies to Easy Reach), we address each separately below.

11.1: The Shareholder Non-Competition Clause
¶ 11. We find that the court was correct in finding that the terms of paragraph 11.1 are reasonable. This non-competition clause, which relates only to shareholders, is limited by both duration and location. Specifically, the clause restricts competitive activity within the first six months after a stockholder sells his interest in the company. The definition of "compete" contained in paragraph 12.5 limits the clause as to the location within five miles of any place where Hub City has a contract at the time a shareholder sells his interest in the company.[1]
¶ 12. Since the clause is reasonably limited as to duration and location, we find that there is enough evidence in the record to support the chancellor's finding that the non-competition clause contained in paragraph 11.1 is reasonable, and therefore valid.

11.2: The Easy Reach Non-Competition Clause
¶ 13. We find that this clause is not limited as to either duration or location and is therefore unreasonable and invalid. Read literally, the terms of paragraph 11.2 forever bar Easy Reach from engaging in the manufacture of brushes. Because the definition of "compete" contained in the agreement does not apply to Easy Reach, the clause is unlimited as to location as well. As stated in Kennedy, the reasonableness of a non-competition clause is largely a function of the specificity of its terms, specifically whether the duration and geographic limits of the clause are identified.
¶ 14. Based on the present record, there is nothing to indicate that the Easy Reach non-competition clause is reasonable. The five mile limit as to duration is contained only in the section of the agreement that defines "compete." However, the only time that "compete" or one of its conjugations appears in 11.2 is in the following clause: "that HUB CITY BRUSH shall not compete with EASY REACH *1144 BRUSH, INC. in the sale to truckstops...." (emphasis added). Although the paragraph attempts to restrict the business of Easy Reach by stating that "EASY REACH BRUSH, INC. shall not manufacture any brushes except paint brushes," nothing in the paragraph uses the term "compete" in connection with Easy Reach.
¶ 15. Paragraph 12.5, which contains the agreement's definition of "compete," specifically reads:
Compete. "To Compete" and "to Compete with HUB CITY BRUSH" both mean to engage in the same or any similar business as HUB CITY BRUSH in any manner whatsoever, including competing as a proprietor, partner, investor, stockholder, director, officer, employee, consultant, independent contractor, or otherwise, other than any activities as a principal of EASY REACH BRUSH, INC. within a geographic area within five miles of any facility in which HUB CITY BRUSH has a contract at the time that such Stockholder first ceased to be a Stockholder.
Paragraph 11.2, which contains the Easy Reach non-competition clause, does not contain the word "compete" or any of its conjugations with reference to Easy Reach. Therefore, the definition of "compete," which contains the only potential geographic limitation, cannot apply to the Easy Reach non-competition clause. Instead, a reading of the entire agreement indicates that Easy Reach was forbidden from manufacturing brushes everywhere for an infinite length of time.
¶ 16. Hub City seems to argue in its brief that the non-competition clause should be upheld because Brant and Easy Reach have continued to be profitable despite paragraph 11.2 of the shareholder's agreement. For example, Hub City argues in its brief: "Appellant quite naturally makes no mention of the fact that his income from the brush business is over $500,000 a year, more than all the rest of the family combined." This reasoning is echoed by the chancellor's ruling, which found:
It seems that the main reason to strike down a non-compete clause is to prevent any undue hardship on the part of the one bound ... [but] there has been no proof that the clause has caused any sort of undue harm on the business of Easy Reach; and in fact evidence shows that Brant typically earns approximately $500,000 per year as a majority shareholder of Hub City.
¶ 17. With all due respect to the learned chancellor in this case, evidence indicated that Easy Reach's business has been impacted by the non-competition clause. Brant specifically testified that the market for brushes has changed "drastically" in recent years:
I think it was `98 we got in trouble because the competition was so great from import of brushes from China, and at that point we started marketing a product with extra nice display racks which enabled us to keep our head above water ... but now the competition has basically copied our racks and they've got racks just like we do, and we're having a hard time competing on a price level.
When questioned directly by the court, Brant testified that "this year we've [Easy Reach] had about a 40 percent drop in profits." When the court asked, "So you're saying unless you expand, then [your daughter's] future as far as the company, your company is concerned, would be limited," Brant responded, "Well, I foresee that the company won't be around in future years because the competition has gotten so strong and my hands are tied to compete with them  my competition with the brushes coming in from China." *1145 Far from contradicting these statements by Brant, Wayne testified that Hub City is having "similar problems" to those of Easy Reach in terms of dealing with imports. Robert testified that "We [Hub City] are suffering drastically due to imports.... I can buy imports cheaper than I can manufacture brushes.... We're in the same boat with the market. I understand what Brant is saying because I experience it every day of my life." (emphasis added).
¶ 18. Given the above testimony, we do not see the lack of hardship that the chancellor in this case cited as the basis of his judgment. The only factual support cited by the chancellor is that "evidence shows that Brant typically earns approximately $500,000 per year as a majority shareholder of Hub City." We fail to see what Brant's earnings as a majority shareholder of Hub City have to do with any hardship placed on Easy Reach due to the non-competition clause. Furthermore, an individual could make three million dollars per year and still suffer hardship from a non-competition clause if he could make six million dollars per year without the non-competition clause. The size of Brant's salary says nothing about the hardship that Easy Reach has suffered as a result of the non-competition clause.
¶ 19. The chancellor cited Cooper v. Gidden, 515 So.2d 900 (Miss.1987), for the proposition that non-competition clauses involved in the sale of a business are less strictly scrutinized that non-competition clauses between employer and employee. While Cooper does hold that non-competition clauses are less closely scrutinized "where the sale of a business's goodwill is involved," nothing in the case indicates that non-competition clauses in a business context can be unreasonable.[2]Id. at 905. In fact, Cooper expressly states in conclusion: "After reviewing the present case, we are confident that Cooper entered into a valid covenant not to compete, reasonable as to both time and geographic location, as was found by the chancellor." Id. (emphasis added). Herring Gas Company, Inc. v. Whiddon, 616 So.2d 892 (Miss. 1993), which the chancellor also cites as support, similarly does not indicate that non-competition clauses in a business context can be unreasonable as to duration and geographic scope.
¶ 20. It is clear from a reading of the clauses at issue that paragraph 11.2, which restricts Easy Reach from manufacturing brushes, is not limited as to duration or location. No other evidence supported a finding that the clause was otherwise reasonable for some reason. Therefore, the chancellor should have found that the clause is unreasonable and unenforceable. We reverse and render. Paragraph 11.2 is invalid and unenforceable.

2. Fought v. Morris

¶ 21. The chancellor also found that his decision was necessitated by the holding of Fought v. Morris, 543 So.2d 167 (Miss. 1989), which holds that majority shareholders of a company must be "intrinsically fair" to minority shareholders and owe a fiduciary duty to the minority shareholders. Id. at 171. The chancellor in the present case interpreted this to mean that: "If this Court were to invalidate the non-compete clause set out in the Shareholder's Agreement, this would in effect allow Brant to breach his fiduciary duty toward the shareholders of Hub City by possibly putting them out of business through competition."
*1146 ¶ 22. Fought provides no basis for upholding the clause. While it is true that Brant possibly could violate the principles detailed in Fought, it is undisputed that he has not done so to this point. No evidence was presented indicating that Brant has, as of yet, done anything to jeopardize Hub City's business. Brant testified that he has faithfully followed the terms of the non-competition clause and has not manufactured brushes. Furthermore, Brant testified that, if he were allowed to manufacture brushes, he did not foresee competing with Hub City because Easy Reach and Hub City compete in different markets. Until this point, Brant has acted in an "intrinsically fair" manner toward his fellow shareholders, and there is no reason why he could not continue to do so, even if the non-competition clause is voided. Therefore, Fought provides no reason to uphold the clause.
¶ 23. THE JUDGMENT OF THE CHANCERY COURT OF FORREST COUNTY UPHOLDING NON-COMPETITION CLAUSE IS AFFIRMED AS TO THE SHAREHOLDER NON-COMPETITION CLAUSE AND REVERSED AND RENDERED AS TO THE EASY REACH NON-COMPETITION CLAUSE. ALL COSTS OF THIS APPEAL ARE TO BE SPLIT EQUALLY BETWEEN THE APPELLEE AND THE APPELLANTS.
KING, C.J., LEE AND MYERS, P.JJ., SOUTHWICK, CHANDLER, GRIFFIS, BARNES, ISHEE AND ROBERTS, JJ., CONCUR.
NOTES
[1] During his testimony, Brant questioned the meaning of this limitation. When asked on cross-examination by Hub City's attorney to admit that the geographic limitation contained in paragraph 12.5 is reasonable, Brant responded: "I don't know about the terminology of the contract you're talking about because there's no contracts [by Hub City] with customers as far as I know. You don't get contracts, so I'm not sure about that terminology." Despite repeated attempts to get Brant to admit that the five-mile limit is reasonable, Brant refused to testify that Hub City does business through contracts. Therefore, Brant maintained that he could not testify about the reasonableness of the geographic limitation, since the limit was based on a five-mile radius around locations where Hub City has contracts, which Brant testified Hub City does not have. Although this testimony casts doubt on the clause, we note that no other testimony was produced indicating that no meaning can be derived from the clause. Therefore, the chancellor reasonably could have found that the clause was limited.
[2] We also note that this case does not involve the sale of a business or the sale of a business's goodwill. Brant has sold neither Easy Reach nor Hub City, nor has either been sold to him.